It did last night. It wasn't too bad when I left this morning, but I took a different route than your Honor took. Good afternoon, Your Honor. My name is Michael Tremann. I represent Mr. Washington. We have raised several issues in our briefs dealing both with the substantive conviction and also with regard to the sentencing. I would like to address one issue from each of those general areas. With regard to the conviction, I'd like to address the 801d1b issue relating to the admission under the theory of a prior consistent statement of the two cooperating witnesses' statements to the FBI agent. The language that makes the prior consistent statements not hearsay requires that the statements that are going to be introduced be introduced prior to the time that the supposed motive to falsify arises. During the course of the trial and the cross-examination of both of those witnesses, Mr. Alexander and Mr. O'Neill, the defense established that they were both approached by the government with offers of cooperation as part of a deal before any of the statements that are an issue were made by either one of them. In the case of Mr. Alexander, that offer was made in the parole office at the time that he was initially contacted by agents of the FBI and in the background by a representative of the United States Attorney's Office and was specifically asked if he wanted to cooperate out of custody in connection with the bank robbery investigation. Therefore, the motive to fabricate with regard to Mr. Alexander arose as of that point in time. That may be motive to talk, but why is it motive to fabricate? All they're hoping to get from this is a benefit. They're going to have their load lightened as a result, but that doesn't indicate why they should point to your client or why they should fabricate something. Well, two things. Number one, the motive to fabricate is the motive to get a benefit. So if the Court's correct … Well, I mean, they get the benefit by talking. Whether they talk truthfully or talk lying probably doesn't matter, although talking with a lie is less likely to result in the benefit they hope to get because it's more likely the government will figure out before the end that these guys are lying. I don't see where the fabrication … I mean, I certainly understand the motivation to talk, but the motivation to fabricate, I think, is something else, and I'm not sure that this provides them with the motivation to fabricate. The offer of getting a benefit for whatever they're going to say is the underlying motive to fabricate. They would have gotten the benefit if they said it was Lincoln, not Washington, if it really was Lincoln. They're getting their motivation to talk. I understand that, but I don't think fabricates the same thing as talk. Well, in the cases that have discussed that, that's the dividing line. When you make an offer to give somebody something, in this case the government, to give somebody, in the case of Mr. Alexander, the opportunity to get out of custody and to, quote, cooperate, unquote, that is the point in time at which the motive to fabricate comes into existence. It's the opportunity to get a benefit, and therefore, I have a motivation. And that's distinguished from if they had just had a conversation in which, to take Your Honor's example, they had said, why don't you talk to us about the bank robberies? That's a different kind of inquiry than I'll tell you what we're going to do for you if you're willing to talk to us about the bank robbery, we're going to let you get out of custody, et cetera. The further issue with regard to both Mr. Alexander and with regard to Mr. O'Neill are the fact that they did, in fact, lie in both of their initial contacts. In Mr. Alexander's case, he lied outright about a number of things. So, again, he clearly was being motivated to not tell the truth because he, in fact, did not tell the truth. Kennedy. Well, you argued that, didn't you, in your closing argument? The answer is yes, Your Honor, I did argue that in the closing argument. See, you know, let me tell you this, it's awful hard and it's rare that you get a reversal based on an erroneous evidentiary ruling. And I appreciate that, Your Honor, but this is not just some miscellaneous evidence. These two individuals are a key part of the government's case, key because they are supposedly the insiders and they are supposedly the ones who are in a position to finger Mr. Washington. They have pictures and all that. Well, they did have pictures and there were some substantial disputes in the evidence as to whether or not the individual they claimed was Mr. Washington was, in fact, Mr. Washington. And there was evidence about that. But didn't he say, yeah, that's me or something like that? When he was interviewed by the FBI, he either said, anybody can see that's me or anybody can see that's not me. He said, according to the testimony, both of those things. What the government was able to do by introducing the testimony by Agent Tagliaretti about the alleged prior consistent statements was to make Agent Tagliaretti the person who could compare and contrast that a prior statement was matching between these two individuals. And that's part of what he testified to. Didn't the people at the bank, didn't they ID him? There were two people from the bank who made eyewitness identifications. One of those people identified Mr. Washington. The other person had identified Mr. Washington in a photo spread, but in the courtroom identified the co-defendant, if you will, as being the person who was in the photo spread and the person who robbed the bank. She did not identify Mr. Washington. The person who identified Mr. Washington had said originally in her interview to the agents at the bank on the day of the bank robbery that there were three people who were involved in the bank robbery. Then there were some meetings at the bank and there was some discussion among the different people, and a few days later she suddenly concluded that there were four people involved in the bank robbery. So she has some credibility issues with regard to who she actually saw at the bank and where they were, and the other person did not identify him in the courtroom. Wasn't there examination at trial that suggested that Alexander and O'Neill had conferred with each other and gotten their stories straight to make them parallel and consistent at a point in time later than the subject of the agent's testimony? And the answer is yes, Your Honor, there was. That was part of, but not the only part of, their cross-examination. And that had to do with the fact that Mr. Alexander's statements to the government changed over time, and some of that time coincided with his ability, having been with Mr. O'Neill, to say things about Mr. Washington that he had not been able to say or had not said, as the case may be, earlier. So the scope of dealing with these individuals in terms of the time pattern takes place over a long period of time. It begins when they first are contacted, then they have a series of interviews and are put together right up through and including coming to the courthouse during trial. In terms of, just to go back briefly with regard to Mr. O'Neill and point out that he lied when he was initially in court about his identity. And both Mr. O'Neill and both Mr. Alexander, initial contacts, had the same motivation for their not being truthful. And that motivation was to get out of custody, which is why they both acknowledged the circumstances under which they told those lies. And that's what the government offered them, was the opportunity to either have reduced charges and or get out of custody. The rule permits, with regard to a prior statement by a witness, a testimony that is consistent with the declarant's testimony and is offered to rebut and express or implied charge against the declarant of recent fabrication or improper influence or motive. To the extent that the suggestion being made by the defense was that at least some of this testimony was fabricated when Alexander O'Neill conferred, couldn't it be offered, couldn't the agent's testimony be offered to indicate that prior to this opportunity for the two of them to confer, they were, in fact, telling the story separately to the agent that was consistent on pertinent points? Only if you ignore the last part of the rule of evidence that requires that the statement has to have been given, the one Your Honor is talking about, prior to the time that the supposed motive to falsify arose. It's talking about when the motive to falsify arose, not when the parties had the subsequent opportunities to get together and falsify their testimony some more. Are those necessarily linked? I mean, what is it you're pointing at when you say the last part of the rule? I'm pointing at the language of the rule that talks about that the statement that the agent's going to admit has to have been made prior to the time that the supposed motive to falsify arose. Your Honor focused on when they had an opportunity to get together and talk. The issue in the rule has to do with when the motive arises. I think they're separate things. Yes. They're not necessarily so. Even if the motive to testify has arisen in a certain fashion before, the question of whether or not two separate witnesses can get their story straight may itself be a pertinent issue at trial. It may be, but you can't get it in by admitting what is otherwise an admissible hearsay, which is what the government did in this case. It's not an issue of whether or not it's relevant. It's an issue of whether or not it's admissible because it's hearsay. Okay. Any other issues? The second issue that I wanted to address had to do with the one of the sentencing issues, and that sentencing issue had to do with using Mr. Washington's juvenile convictions to increase his criminal history score. And I asked the Court to consider substantively addressing that issue for a couple of reasons. One is because in this circuit for the cases that I've cited and also in my letter in brief, it appears that this circuit is taking the position that the use of a juvenile prior conviction is limited, although the circuit has not gone to the extent of taking the position that it can be used – it cannot be used in connection with the calculation of a criminal history score. And the reason why it's important for the Court to address that issue is because in this case, as an example, what took place with regard to Mr. Washington is that the district court reached the determination that a juvenile adjudication that took place when he was 9 years old for stealing candy should be considered the same as if it had been an adult conviction. The same thing is true with a conviction at 11 years – I'm sorry, a juvenile adjudication at 11 years old. Another one at 13. Kennedy. Kennedy. And the 15-year-old and 17-year-old offenses for which there were juvenile adjudications would not even have been a crime if Mr. Washington had been an adult at the time that those events took place, because both of them had to do with his status as a juvenile. What's happening in the State of California, for example, with regard to these juvenile convictions, and Mr. Washington is a classic example, is that someone at 9 years old comes into the system. There is no right to a jury trial with regard to the allegations. And as a practical matter, the lawyers handling those cases and the 9-year-old boy who's sitting there in a courtroom dealing with that is looking at what? He's looking at a status offense that has to do with the entire juvenile welfare system in the State of California. To turn around and now take the position, because of the sentencing guidelines that were instituted, that that is the same thing as if he had been an adult and he had committed that crime for purposes of his sentencing now, takes that entire system and turns it on its head. It turns it on its head because it's now taken what is not supposed to be that kind of an adversary proceeding, and as a practical matter, requires that it be that kind of an adversarial proceeding. Because now lawyers handling those cases have got to look at them from a different standpoint. You have to look at a 9-year-old now as if he's going to ultimately be held responsible for a prior adult conviction. And that isn't the way the California juvenile system is designed to operate, and I submit that under the authorities from the Ninth Circuit and under the subsequent Supreme Court authorities that have talked about the Sixth Amendment right to jury trials, that is not the way the guidelines should be applied. Merely sending this case back for resentencing for some of the other issues under this Court's Ameline 3 decision that have been raised in the brief doesn't get to this point. I submit that this Court should address this point in whatever ruling it's going to make. Thank you. We'll hear from the government. Good afternoon, Your Honors. May it please the Court. Elizabeth Yang on behalf of the United States. I would like to begin by answering a question that you, Judge Pragerson, first asked counsel regarding the state-of-the-evidence that was presented at trial against the defendant. I'd just like to clarify a few matters. At trial, two victim bank tellers testified that weeks after the robbery, and we're talking four to six weeks after the robbery, they were presented with six-pack photo spreads containing a photograph of the defendant. Both victim bank tellers testified, and this was not contradicted by any contrary evidence, that they immediately and unequivocally identified the defendant, Eric Washington, as one of the robbers that was in the bank on the day of the robbery. Approximately a year later, when they testified in court, one of those tellers was able to, again, identify defendant Eric Washington as one of the robbers she saw in the bank on the day of the robbery. The other teller was unable to do so. However, unlike defense counsel's representation, both bank tellers did identify defendant Eric Washington as the robber weeks after the robbery. In addition, as Your Honor pointed out, there were bank surveillance photographs. There were statements that defendant made in a post-arrest interview where he initially pointed to a photograph and said, anybody can see that's me in the picture. Later on in the interview, he laughed and said, oh, that's not me in the picture. So there were statements put into evidence regarding his own identification of himself as one of the robbers on the day of the robbery. And there were also the testimony of the two co-conspirators, the cooperating eyewitnesses, Derek O'Neill and Joe Alexander, who both again identified the defendant as a member of their robbery crew and again testified, uncontradicted or uncontradicted by other evidence, that he was there on the day of the robbery. They had recruited him. He had gone in with Mr. Alexander. So that was the state of the evidence presented at trial. Addressing the Rule 801d1b argument, Judge Clifton brought up a good point that I was going to argue. Under Rule 801db, a prior consistent statement becomes admissible if there is an express or implied charge of either improper motive or recent fabrication. And here, as Your Honors are well aware, the record is replete with references to defense counsel's attempt, through cross-examination of both cooperating witnesses, to infer that they had been colluding about their testimony, that they had ridden in the same van to the jail each day before they testified, that they were put in a holding cell in the courthouse before they – the same holding cell area in the courthouse before they testified, that they were housed in the same jail facility pending trial, and that in that jail facility they were able to communicate through kites and through other forms of communication. So the implied inference, even if you recall that, that they had recently fabricated their testimony is very strong. Kennedy, through kites? Yes, Your Honor. Kites are pieces of paper which the inmates write notes on. They fold it up until it's literally in the position of a kite. I am not familiar with how kites are sent in Santa Ana Jail, which is where these cooperating witnesses were housed. I am familiar, however, with how kites are sent at the Metropolitan Detention Center. And there, my understanding is kites can be sent actually through the plumbing. They can flush them from the toilet system. They also can pass them to inmates who work sort of as trustees, who can pass out information. And they can also be slid under doors that sort of separate different wings of the prison. Kites can also be put, you know, in various locations in books when you go to the library, et cetera. So there's a way to transmit information while in prison if you are not housed in the same housing unit or even on the same floor. And through cross-examination, defense counsel did raise the issue. Kennedy, I'm not sure I want to know. I'm always interested in plumbing issues. You know, my understanding, Your Honor, I'm very bad at plumbing. And my very limited information is they can attach a string with almost like a they fashion some sort of hook to the kite. They put it in the toilet. They flush the toilet. The prison system has sort of a very linear, my understanding, plumbing system. There is common pipes everywhere. So you can't flush it or pass it to one inmate. It may not be the intended recipient, but ultimately it can get to the intended recipient. And we have known kites to be, it is quite incredible, but to be passed from inmate to inmate in no time at all. And during cross-examination the least likely way they would have gotten together in this circumstance, because they were going back and forth in the same van. They could talk to each other and so forth. Isn't that really the key point? And, Your Honor, that is the key point that defense counsel tried to stress through cross-examination, that they would ride in this van to the court. It would take anywhere from 45 minutes to an hour and a half, depending on traffic. There were only the two of them in the van. You know, that sort of line of questioning. So they were actually not. They were housed in separate facilities apart from MDC at the time of trial. Faced with that sort of implied assertion, the government did, through its direct examination of the case agent, inquire into questions regarding what the cooperating witnesses had said previously. Now, I would just like to point out for the Court that in the record, at government's exeter of record at 624 to 30 and 655 to 58, the Court will see that the government asked very limited questions of the agent regarding these prior consistent statements. Primarily because through cross-examination of both cooperating witnesses, both defense counsel thoroughly covered literally every meeting that these cooperating witnesses had had with the government, whether it was with the case agent or with an AUSA. So the substance of virtually every meeting and the topics covered and what the cooperating witnesses said was already placed before the jury. So the government did ask very limited questions of the case agent regarding these – this area. And again, to the extent that there was any error in the admission of this very limited testimony, the government would submit that it was harmless error. As I previously stated at the outset of my argument, there was substantial evidence of defendant's guilt, with or without this very limited portion of the case agent's testimony. The case agent's testimony simply repeated the identity of defendant as one of the members of the robbery crew, as two victim bank tellers, as the two cooperating witnesses, and frankly, as defendant himself had previously done so. And much like the case of Iriarta-Ortega, here no new facts were placed before the jury through this very limited questioning of the case agent. And in fact, there was no significant credibility – effect on the credibility of the cooperating witnesses, because both defense counsel had thoroughly cross-examined them on their plea agreements, on the benefits they expected to get from the government, on their prior consistent and inconsistent statements. They had covered pretty much everything with these two cooperating witnesses, as the record would show. Addressing the other issue that defense counsel raised, the sentencing issue, the government has, as the Court is aware, filed a cross-appeal on the sentencing of defendant Eric Washington for his 924C conviction. The government contends that the district court misapprehended its sentencing authority when it sentenced Mr. Washington to five years instead of seven years for the brandishing of the firearm. And the government has asked this Court to remand for resentencing on that issue. The government has also stated in its papers that should the Court grant the government's cross-appeal and remand for resentencing, the government would not object to defense counsel's request for a Booker resentencing, essentially an open resentencing. So that's a practical matter, because of the passing of the district judge, is there really any option other than vacating and remanding for resentencing? For resentencing? I agree, Your Honor. I don't think there really is any option. I think at this point, particularly given the Court's recent – a panel of this Court's recent decision in United States v. Dare, which was affirming a similar 924C mandatory minimum conviction based on judicial fact-finding, that this sentence does need to be sent back to the district court for resentencing. And since we're going back to the 924C issue, the government would not object to a full open sentencing on all other issues. Well, but I don't mean to presume an acceptance of your argument with regard to the 924. Yes, Your Honor. And indeed, I'm really not sure at this point – and I'm not – it's possible your office hasn't made a judgment on this, but I'm not really sure how a new district judge could be expected to pick the matter up and make the judgment that 924 would seem to require, I mean, the cross-appeal judgment. So let me put the question in a broad fashion. Is it your office's current – is the government's current position that you are pursuing your cross-appeal? Yes, Your Honor. And I do believe that the new district court judge who has been assigned this case can make that determination. What he or she will have before them is not just the probation officer's PSR, as well as the addendum to the PSR, which was also issued, both of which, by the way, Your Honors, did find that there is a factual basis for brandishing, a finding which defense counsel in his sentencing papers has never contested. But the district court judge will also have the trial testimony in the form of transcripts. Much as we've produced them to this Court, of course, it would be produced to the district court judge. And based on the evidence and the testimony that was adduced at trial, there is more than sufficient evidence for the Court to find beyond a preponderance of the evidence that a firearm was in fact brandished during this robbery and that the defendant, Eric Washington, is liable for that brandishing via a Pinkerton theory of conspiracy liability. I direct the Court to the government's excerpts of record. We have to get into Pinkerton now, huh? Your Honor, there was a Pinkerton instruction given in this case, and the government did proceed under both a straight conspiracy theory. There was a 371 conspiracy charge, as well as for the armed bank robbing, the brandishing of the firearm, a Pinkerton theory of liability. Given the fact that, as defense counsel points out, the government agrees, there was no evidence adduced at trial that any witness actually saw defendant Eric Washington himself carry a firearm. There was ample testimony from other witnesses that at least two of the robbers at least one of the other robbers, two of the other robbers, I'm sorry, Your Honor, carried a firearm during the robbery and in fact pointed it at three different victim bank tellers. Kennedy, those are the individuals? Your Honor, that's actually an interesting point. And this goes to the government's argument that the district court did not understand that it could sentence Mr. Washington 7 years based on judicial fact-finding. One of Mr. Washington's co-defendants at that trial, Andrew Lee Carter, Jr., who has filed a notice of appeal with this Court but has not yet filed his papers, was sentenced by that same judge, based on the same evidence presented at trial, to 7 years mandatory minimum for the brandishing of a firearm. And again, with regard to Mr. Carter, the evidence at trial did not establish that he personally carried a firearm, but that two other robbers, two of the other robbers did, and he was found liable under Pinkerton theory. Unless Your Honors have any other questions about any of the other issues, I'll reserve my time to respond to any of defense counsel's argument on the cross-appeal. Kennedy, you don't think that part of it is the credibility of witnesses. How is a judge with a cold record going to get into that issue? Your Honor, and with regard to the new judge, the new judge is Dale Fisher.  Dale Fisher. Dale Fisher. Yes. And, Your Honor, I do think that even based on a, quote, cold record, the judge can make that determination. The facts are very clear. Many of them, with regard to the victim bank teller testimony, were not controverted with regard to being, having a firearm pointed in their face, you know, being ordered at gunpoint to turn over their money. That sort of testimony was not an issue. And moreover, even at the sentencing stage, because of the Deere opinion, as well as Harris and McMillan, which are still good law post-Booker, it is a judicial determination that the judge can find by preponderance of the evidence. And the government, in addition to the trial testimony, could provide, as it did to the probation office, the reports of interviews of these witnesses subsequent to the robbery. All other documentation or other evidence that the government has, in addition to the trial testimony, that would establish the brandishing by preponderance of the evidence. But I think that the record itself is very clear that there was more than sufficient evidence to have that finding.  Breyer, did Judge Ray give him the 5 years instead of the 7? Your Honor, I think the record is very clear. Judge Ray believed, as defense counsel had argued, that Blakely precluded the imposition of a 7-year mandatory minimum sentence because Judge Ray believed that Blakely required that the brandishing fact be proved and found by a jury beyond a reasonable doubt. Now, in the indictment, in count 3 of the indictment, the government did charge that a firearm was used and carried during and in relation to a crime of violence, namely by brandishing that firearm. Defense counsel argued that that was insufficient for finding of brandishing, that there needed to be a special verdict form where the jury not only found the defendant guilty of count 3, but also found him guilty that the use and carrying was by brandishing. The government's position was that that was not necessary and that even post-Blakely that was not necessary. The district court, Judge Ray, did believe that it was necessary. And, in fact, when the government asked him at sentencing to impose an alternative sentence in the event that his understanding of Blakely and what it required was wrong, Judge Ray refused. And that refusal is at government excerpts of records 1111 to 1114. And that is why the government posits that it was not necessary. Kennedy, what do you base your argument that this brandishment is not something the jury should consider? Your Honor, I think the case law is very clear. Under both Harris and McMillan, the brandishing of a firearm is a fact that the judge can find by a preponderance of the evidence. And as a panel of this Court recently made clear, no. Indair or Daray, one or the other. Indair or Daray, Harris is still good law. And until the Supreme Court overrules Harris, this the Ninth Circuit will not anticipatorily overrule it and will maintain that Harris is still good law. And under Harris, it is very clear the mandatory minimum sentence for a 924C can be based on facts found by a judge by a preponderance of the evidence and need not be presented to a jury and proved beyond a reasonable doubt. The Supreme Court says so.  Thank you, Your Honors. Just a couple of points in connection with the cross-appeal. There's nothing in the record that indicates that Judge Ray believed that he could not have imposed the 7-year sentence if, as a judicial fact-finder, he had concluded it was appropriate. There isn't a single line anywhere in the transcripts or cited in any of the briefs that supports that representation. What he did do is he decided not to impose it. So the judicial fact-finding, as far as that issue is concerned, has actually taken place, and at this point in time, there's no legal basis for the Court to reverse that under the argument being advanced by the government. The only other available argument is that because of the Blakeley decision, that was a decision that had to be made by the jury and that, therefore, Judge Ray did not have the authority to make it. Under either one of those two alternatives, the government's cross-appeal should be not sustained. It should be denied. Let me just address, finally, the comment about the strength of the government's case so the Court understands the pieces, because we've raised several arguments in our brief that go beyond just that one evidentiary issue. The government's case was based on the two tellers who came into court and only one of whom could identify the live body sitting in the courtroom, number one. That's the same teller who admitted that she actually originally only reported there being three people involved in this bank robbery, not the four that she would be. Kennedy, there's a lot going on in a bank robbery, and, you know, so three, four. I know, but, Judge, how do you get from telling the police three on the day of the bank robbery to two weeks later coming up with four? I don't disagree with you that she may be wrong. You know, maybe you think about it. Yeah, I think I remember another one there. Or maybe somebody tells you that there was somebody else in the bank and that's how you come up with four. Yeah, yeah, a lot of things can happen, but that's not such a big a deal. It simply indicates that those people's – their credibility was suspect. Now, the two insiders who testified, their credibility was suspect from day one because of their admission as liars and because of the fact that they made statements that were contradictory and that along the line the nature of their statements changed, which was the purpose of the cross-examination. This was not a cross-examination, which was just based on what took place when they were in the same jail facility and when they were driven back and forth to court at the same time. It had to do with what they had said over a period of time when they were interviewed by the FBI agents that preceded when they came to trial, as well as what they did when they were in trial. They have the inquiry that we've raised with regard to the validity of the statements made by Mr. Washington during his FBI interrogation. And in connection with those, any fair reading of the agent's testimony indicates that Mr. Washington said two things, depending upon how well the agent heard it. He either said, anybody can see that's me. Kennedy, I have a conflict and the jury resolved it. And the answer is, yes, Your Honor. So my point is, is that each of those things standing by themselves are subject to having been attacked, which is why the objections we've raised in the appeal are so significant, because they go to two of those three, if you will, pillars of the government's case. Thank you. Kennedy. All right. Thank you all. And this Court will recess until 9 a.m. tomorrow morning.
judges: Hug, Pregerson, Clifton